Receipt number 9998-3845358

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

MAR 15 2017

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| SANFORD HEALTH PLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

Case No.  **17-357 C**

## COMPLAINT

Plaintiff Sanford Health Plan ("Plaintiff" or "Sanford Health Plan") brings this action seeking damages and other relief for the United State Government's (1) violation of Section 1342 of the Patient Protection and Affordable Care Act ("Section 1342") and 45 C.F.R. § 153.510(b) ("Section 153.510"); and (2) breach of its risk corridors payment obligations under an implied-in-fact contract.  In support of this action, Plaintiff states and alleges as follows:

**NATURE OF ACTION**

1.      In March 2010, the United States Government ("Defendant" or "Government") enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), 124 Stat. 119 and the Health Care and Education Reconciliation Act, Pub. L. 111-152, (March 30, 2010), 124 Stat. 1029 (collectively the "Affordable Care Act" or the "Act" or "ACA").

2.      The Act represented a major shift in healthcare regulation and coverage in the country.  The ACA ushered in a host of market-wide reforms and requirements affecting the private health insurance industry.  Among other things, the Act addressed the scope of covered services, availability of coverage, renewability of coverage, out-of-pocket costs for consumers, pricing, and other coverage determinants.  The Act limits health insurance product variation and

restricts pricing and underwriting practices.  For example, by placing restrictions on the premium spread based on the age of the policy holder, the Act ensures that premiums are based on community rating (*i.e.*, the risk pool posed by the entire community) instead of an assessment of an individual's health status.  The Act also provides for guaranteed issuance of coverage and renewability of coverage.

3.     The ACA requires individuals to purchase coverage if they are not otherwise insured, and also created an elaborate scheme of federal subsidies to offset the cost of coverage. Another of the hallmarks of the Act is its establishment of health insurance exchanges, which are online marketplaces where individuals and small groups may purchase health insurance.  The ACA's individual mandate coupled with the availability of federal subsidies dramatically increased the number of individuals—many previously uninsured—purchasing health insurance. Created by Title I, Subtitle D of the ACA, the health insurance exchanges "are designed to bring together buyers and sellers of insurance, with the goal of increasing access to coverage" offered in a competitive marketplace.

4.     In order to facilitate affordability and access to competitive health insurance through the exchanges (also referred to as "marketplaces"), Congress encouraged health insurance issuers to offer qualified health plans in the individual and small group markets.  A qualified health plan ("QHP") is a health plan that meets certain standards established by the Centers for Medicare & Medicaid Services ("CMS") and the exchanges in order to be sold to consumers through the exchanges.

5.     Additionally, the ACA requires health plans in the individual and small group markets to cover essential health benefits ("EHBs"), which include items and services in the following ten benefit categories:  (1) ambulatory patient services; (2) emergency services; (3)

hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.  In many cases, the EHBs are an expansion of what was covered pre-ACA.  Benefits previously subject to copays or other cost-sharing mechanisms are now mandated to be provided at no cost to the insured, which has made it difficult to predict utilization of these services.

6.     The health insurance exchanges presented a new and uncertain risk pool for health insurers.  If health insurers chose to participate in the exchanges, they were obligated to confront the uncertainties of pricing health plans for new populations.  Insurers had neither sufficient data to accurately predict the needs of the newly insured individuals signing up for plans starting in 2014, nor a model to confidently price these ACA plans to reflect the medical costs associated with this new and untested marketplace.

7.     To minimize the risks these uncertainties pose, the ACA features three marketplace premium stabilization programs:  risk adjustment, reinsurance, and a temporary "risk corridors" program for each of the 2014, 2015, and 2016 benefit years (a "benefit year" is the calendar year for which a health plan provides coverage for health benefits).  These premium stabilization programs were designed to limit the effects of adverse selection and to mitigate the uncertainty inherent in establishing rates for new, unquantifiable health insurance risks in the context of an untested regulatory framework.

8.     The risk corridors program is required by statute to be modeled after a similar program enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act signed into law in 2003.

9.      Specifically, Section 1342 of the ACA contains two related mandatory terms for all issuers of QHPs on an exchange:  (1) any health insurer selling a QHP on the exchange (a "QHP issuer") would receive compensation from the Government if its losses exceeded a certain defined amount due to high utilization and high medical costs; and (2) the QHP issuers would pay the Government a percentage of any gains they made in excess of similarly defined amounts. The Act's framework thus compares "allowable costs" (essentially claims costs and adjustments for quality improvement activities, reinsurance, and risk adjustment charges or payments) with a "target amount" (the QHP's premium less its allocable administrative costs).  If the ratio of a QHP issuer's allowable costs to the target amount is greater than 1, then it experiences losses; but if the ratio is less than 1, then it experiences gains.

10.     In other words, the risk corridors program specifically guarantees that if an insurer's allowable costs "for any plan year" exceeded the target amount, the U.S. Department of Health & Human Services ("HHS"), CMS's parent agency, "shall pay to the plan" a portion of such excess allowable costs pursuant to the payment-calculation formula set forth in the ACA. And, conversely, plans that incur allowable costs below the target amount in the benefit year shall pay a portion of the differential to the Government.

11.     The only significant precondition for the Government's payment obligations is the calculation of revenue and cost data submitted to CMS by the QHP issuers.

12.     Despite these express and binding obligations, the risk corridors program—like the ACA as a whole—has been the target of subsequent congressional actions designed to impede CMS's ability to administer the program as mandated by the ACA.  In particular, in the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235) ("2015 Spending Law") and, a year later, the Consolidated Appropriations Act, 2016 (Pub. L. No. 114-

113) ("2016 Spending Law"), Congress prohibited CMS and its parent agency, HHS, from using certain accounts to fund the obligated risk corridors payments.  Specifically, Congress prohibited CMS from using the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, as well as funds transferred from other accounts funded by the 2015 Spending Law and 2016 Spending Law to the CMS Program Management account for fiscal year 2015 and 2016.

13.     The practical effect of the 2015 Spending Law was that CMS chose not to pay QHP issuers their full risk corridor receivable amounts due for 2014.  During 2014, QHP issuers incurred almost $2.9 billion in losses that were compensable under the risk corridors provisions of the ACA.  However, due to the 2015 Spending Law, over $2.5 billion of the mandatory risk corridor payments for 2014 were not paid.

14.     The QHP issuers on the whole incurred even greater compensable losses in 2015 that CMS will not pay as a result of the 2016 Spending Law.

15.     Nevertheless, Congress did not otherwise restrict availability of federal funds and did not amend Section 1342 to limit, much less eliminate, the Government's risk corridors payment obligations to insurers under the ACA.

16.     Plaintiff in this action is a nonprofit corporation organized under the laws of South Dakota, with its principal place of business in Sioux Falls, South Dakota.  Plaintiff is a QHP issuer under the ACA.

17.     In 2014 and 2015, Plaintiff provided health insurance to its members on the North Dakota, South Dakota, and Iowa marketplaces.

18.     CMS has conceded that Plaintiff is owed $3,665,695.66 under the risk corridors program for its participation in the North Dakota, South Dakota, and Iowa marketplaces for

benefit year 2014.  In addition, CMS has conceded that Plaintiff is owed $5,869,541.98 for its

participation in these same marketplaces for benefit year 2015.

19.     To date, however, CMS has stated publicly in sub-regulatory guidance that it will

not make full payment for benefit years 2014 and 2015 until a later—but as-of-yet

undetermined—date, if at all.

20.     Risk corridors program payments for the 2014 and 2015 benefit years are

presently due to Sanford Health Plan.  By this lawsuit, Plaintiff seeks full payment of the risk

corridors payments to which it is entitled from the Government under the ACA for benefit years

2014 and 2015.  The law is clear, and the Government must abide by its statutory obligations.

Plaintiff respectfully asks the Court to compel the Government to do so.

## JURISDICTION

21.     This Court has jurisdiction over the subject matter of this action pursuant to the

Tucker Act, 28 U.S.C. § 1491.  The statutory cause of action giving rise to this Court's Tucker

Act jurisdiction is Section 1342, a money-mandating statute that requires payment from the

federal government to QHP issuers, like Plaintiff, that satisfy certain criteria.  Section

153.510(b) is a money-mandating regulation that implements Section 1342 and thus also

obligates payment from the federal government to QHP issuers that satisfy certain criteria.

22.     In the alternative, the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101 *et seq.*, a

money-mandating statute, also gives rise to this Court's jurisdiction pursuant to the Tucker Act.

23.     This controversy is ripe because CMS has refused to pay Plaintiff the full

amount Plaintiff is owed for 2014 and 2015 as required by Section 1342 and Section 153.510.

## PARTIES

24.     Plaintiff, Sanford Health Plan, is a nonprofit corporation organized under the

laws of South Dakota, with its principal place of business in Sioux Falls, South Dakota.

25.     Sanford Health Plan is a nonprofit QHP issuer participating in the exchanges in North Dakota, South Dakota, and Iowa.  Overall, Sanford Health Plan has nearly 180,000 members through its fully insured and self-funded health care benefits offered to individuals, families, and businesses.  Sanford Health Plan is accredited as a Commercial and Marketplace health maintenance organization with the National Committee for Quality Assurance.  Sanford Health Plan began providing affordable, high-quality health plans in South Dakota in 1998.

26.     Sanford Health Plan is part of Sanford Health, a non-profit, integrated health system headquartered in Sioux Falls, South Dakota.  Sanford Health is one of the largest health systems in the nation with presence in nine states and four countries, and includes 43 hospitals and nearly 250 clinics.  Sanford Health's 27,000 employees, including 1,400 physicians, make it the largest employer in the Dakotas.  Sanford Health is a recognized leader in health care and strives to provide patients across its vast geography with convenient access to expert medical care, leading-edge technologies and world-class facilities.  In addition to strong clinical care, Sanford Health is committed to education, community growth and research, with initiatives in genomic medicine and specialized centers researching cures for type 1 diabetes, breast cancer, and other diseases.

27.     Sanford Health Plan has conducted and participated in countless outreach and educational sessions throughout its service area on the availability of coverage through the ACA, the mechanics of the marketplace, and the benefit plans it offers.

28.     In short, Sanford Health Plan has aggressively pursued the ACA's goal of connecting the people in its service area to insurance coverage opportunities with the understanding that a broader base of insured is better for the individuals within the pool and the

overall functioning of the marketplaces.

29.     The defendant is the Government, acting through CMS (or CMS's parent agency

HHS).  Unless otherwise noted, references in this Complaint to CMS include HHS where

applicable.

## FACTUAL ALLEGATIONS

### A.     The Affordable Care Act Established a "Risk Corridors" Program With Two-Way Payment Obligations.

30.     The Affordable Care Act established three insurance premium stabilization

programs to address uncertainties in the marketplaces, commonly referred to as the "Three Rs":

(1) a three-year risk corridors program; (2) a three-year reinsurance program; and (3) a

permanent risk adjustment program.  Both the reinsurance and risk corridors programs began in

2014 and concluded at the end of 2016.

31.     Section 1342 of the Affordable Care Act, as codified at 42 U.S.C. § 18062,

created the risk corridors program.  In relevant part that Section states:

> (a) IN GENERAL.—The Secretary *shall* establish and administer a program of
> risk corridors for calendar years 2014, 2015, and 2016 under which a qualified
> health plan offered in the individual or small group market *shall* participate in a
> payment adjustment system based on the ratio of the allowable costs of the plan to
> the plan's aggregate premiums. Such program *shall* be based on the program for
> regional participating provider organizations under part D of title XVIII of the
> Social Security Act.
>
> (b) PAYMENT METHODOLOGY.—
>
> > (1)  PAYMENTS OUT.—The Secretary shall provide under the program
> > established under subsection (a) that if—
> >
> > > (A)  a participating plan's allowable costs *for any plan year* are
> > > more than 103 percent but not more than 108 of the target
> > > amount, the Secretary *shall pay to the plan* an amount equal
> > > to 50 percent of the target amount in excess of 103 percent of
> > > the target amount; and

> (B) a participating plan's allowable costs *for any plan year* are
> more than 108 percent of the target amount, the Secretary
> *shall pay to the plan* an amount equal to the sum of 2.5
> percent of the target amount plus 80 percent of the allowable
> costs in excess of 108 percent of the target amount.

Pub. L. No. 111-148, § 1342 (emphases added).  Section 1342 also includes a provision dealing

with "payments in," requiring QHP issuers to pay amounts to HHS if the plans' actual costs are

less than its targeted costs.  *Id.* § 1342(b)(2).  For both the "payments out" and "payments in"

provisions, the terms "allowable costs" and "target amount" are defined by the statute.  *Id.* §

1342(c).

32.    HHS implemented the risk corridors program in the Code of Federal Regulations

at 45 C.F.R. § 153.510.  In relevant part, Section 153.510 states:

> (b) HHS payments to health insurance issuers. QHP issuers will receive payment
> from HHS in the following amounts, under the following circumstances:

>> (1)    When a QHP's allowable costs *for any benefit year* are more
>> than 103 percent but not more than 108 percent of the target amount,
>> *HHS will pay the QHP issuer* an amount equal to 50 percent of the
>> allowable costs in excess of 103 percent of the target amount; and

>> (2)    When a QHP's allowable costs *for any benefit year* are more
>> than 108 percent of the target amount, *HHS will pay to the QHP issuer*
>> an amount equal to the sum of 2.5 percent of the target amount plus 80
>> percent of allowable costs in excess of 108 percent of the target
>> amount.

(Emphases added.)

33.    This regulation and other regulations adopted by HHS further mandate certain

data reporting requirements and deadlines applicable to the QHP issuers.  45 C.F.R. §§ 153.510,

153.530.  Following verification by HHS of the QHP issuers' data submissions, HHS is required

to pay the insurers based on their plans' excess expenses (one amount for expenses greater than

103 percent and another amount for expenses greater than 108 percent of each QHP issuer's

target amount).

34.    The QHP issuers' and the Government's respective payment obligations pursuant to Section 1342 are graphically depicted in the following chart from the American Academy of Actuaries:



35.    The purpose of the risk corridors program—in conjunction with the other of the Three Rs—was to induce health insurer participation in the health insurance exchanges by mitigating their risk of loss.  Congress recognized that this could only work effectively if the payment obligations were honored on an annual benefit or plan year basis.  The program would hardly be able to serve its purpose of risk mitigation if, after incurring potentially millions of dollars in unbudgeted expenditures over a plan year, QHP issuers could not timely collect the reimbursements owed to them by the Government pursuant to the statutory formula as soon as their plans' accounting for the preceding year was finalized establishing the amounts owed.

36.    Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program, *i.e.*, the statute does not create a single account to service both payments in and payments out.  Nor does

the statute provide that the risk corridors program must be budget neutral.  In other words,

payments out are ***not*** subject to payments in, and vice versa.  The statute is clear that the

Government will share in the losses for plans with higher than anticipated costs so that if,

hypothetically, all plans have higher than anticipated costs, the Government would need to make

payments, even though there would be no insurer payments coming in.  The program could not

have been subject to budget neutrality for the reason stated in the preceding paragraph.  Had the

program been cabined by budget neutrality concerns, the ACA would have failed to attract

sufficient entrants into the marketplaces because the investment would have been too risky.

HHS's timely payment to plans under the risk corridors program is essential to realizing

Congress's intent in the ACA that the program stabilizes premiums.

37.     Indeed, Section 1342 is expressly modeled for just that reason on the Medicare

Part D program, which is also not required to be budget neutral.  *See* 42 C.F.R. § 423.336.

**B.     QHP Issuers Participated in Exchanges and Set Prices in Reliance on the Risk Corridors Program.**

38.     As noted above, the ACA's health insurance exchanges became operational for

the 2014 benefit year.  For Sanford Health Plan to participate in the North Dakota, South Dakota,

and Iowa marketplaces for the 2014 benefit year, it had to submit its premiums to the

Government by May 2013.  Its commitment to participate in the marketplaces was fixed and

irrevocable by September 2013, when it entered into QHP Issuer Agreements with CMS for

participation in the marketplaces.  Sanford Health Plan and other insurers entered onto the

exchanges with the express understanding—based on the plain text of Section 1342—that if their

allowable costs "for any ***plan year***" exceeded the target amount, the Secretary "***shall pay to the***

***plan***" the amounts set forth in the ACA.  The implementing regulations at 45 C.F.R. § 153.510

expressly reiterated this ACA requirement, stating that when a QHP's allowable costs "for any

*benefit year*" exceeded the target amount, "**HHS will pay the QHP issuer**" the amounts set forth in the ACA. The Government gave no indication at that time that it would subsequently refuse to pay its risk corridors obligations, or hold payments due for a particular plan year until a later and indefinite date.

39.     Health insurers had relied on the statutorily mandated risk corridors program and the other premium stabilization programs in setting their premiums for each year of the risk corridors program. It was not until October 2015, long after health insurers had set premiums and agreed to participate for the last year of the risk corridors program, that the Government first indicated that it would pay only 12.6 percent of its obligations under the risk corridors program for the 2014 benefit year. Similarly, it was not until September 2016 that CMS first indicated that it anticipated that "no funds would be available at this time for 2015 benefit year risk corridors payments." CMS then confirmed in November 2016 that it would not pay *any* portion of its obligations under the risk corridors program for the 2015 benefit year.

40.     The ACA's premium stabilization programs were essential to expanding the risk tolerance of entrants to the marketplaces, such as Plaintiff. The existence of the risk corridors program safeguards also helped to prevent unnecessarily high premium rates to offset the many uncertainties of the newly developing individual and small group markets that otherwise made it difficult to create budgets and forecasts.

## C.     The Risk Corridors Program is Contravened After Enactment.

41.     Since its enactment, Congress has not altered the Government's obligations under the ACA's risk corridors program. Despite this, the Government has taken several steps to frustrate its intended purpose: timely and complete payment to QHP issuers in order to retain them in the marketplace and allow them to learn from and adapt to this uncharted new market.

42.     The first such step was in March 2014, when HHS unexpectedly took the position

in sub-regulatory guidance that the risk corridors program would be self-funding or "budget-neutral." Each spring, HHS publishes an annual rulemaking articulating the payment policies and requirements for participation in the ACA marketplaces, the so-called annual Payment Rule. Specifically, in the preamble to the 2015 Payment Rule, issued in March 2014, and related guidance issued in April 2014, HHS indicated that it would attempt to administer the risk corridors program in a budget-neutral manner and would offset liabilities with future collections.

43.     The preamble to the 2015 Payment Rule stated:

[w]e intend to implement this program in a budget-neutral manner, and may make future adjustments, either upward or downward to this program (for example, as discussed below, we may modify the ceiling on allowable administrative costs) to the extent necessary to achieve this goal.

44.     Then, in April 2014, CMS issued a statement entitled "Risk Corridors and Budget Neutrality," asserting:

if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

45.     That 2014 guidance radically departed from what the ACA intended and requires and what the implementing regulation reflected:  the risk corridors program was enacted without regard to annual budget neutrality.  Indeed, in its 2014 Payment Rule, issued March 11, 2013, HHS conceded as much, stating that "[t]he risk corridors program is not statutorily required to be budget neutral."  HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,473 (Mar. 11, 2013).  Further, Congress stated expressly in Section 1342 that the risk corridors program was to be modeled on the Medicare Part D risk mitigation program, which is not budget neutral.  *See* GAO, Report 15-447 (April 2015) at 14, *available at*

http://www.gao.gov/assets/680/670161.pdf  ("For the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer contributions.").

46.      In short, the Government announced by agency fiat in the spring of 2014 that it would aspire to administer the risk corridors program in a budget neutral manner notwithstanding the lack of any statutory basis for doing so, and then reiterated that position for years 2015 and 2016 pointing to the April 11, 2014 "FAQ" on Risk Corridors and Budget Neutrality, suggesting that any decision on how the Government would make QHP issuers whole under the risk corridors programs would be left to some indeterminate later day.

47.      The Government's budget neutrality approach is not supported by law.  Neither Section 1342 nor Section 153.510 provides that the risk corridors payments will come from the pot of payments made to the Government by other insurers (*i.e.*, payments in).  Nor does either provision contemplate permitting the Government to postpone payments that are owed until the following year's collections are accounted for (or, as it seems might be the case should HHS have its way, some indeterminate date in the future, if at all).

48.      On November 19, 2015, Defendant stated that, "HHS is recording those amounts that remain unpaid following our 12.6 percent payment this winter *as a fiscal year 2015 obligation of the United States Government for which full payment is required*."  CMS, Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015).  The statement is extraordinary in that the agency *concedes* that it owes Plaintiff and other QHP issuers payment under the risk corridors program, *refuses* to pay the amounts due, and offers instead to pay "12.6 percent" of what is owed with a vague promise to pay more at some indeterminate point in the future.

**D.**      **Congress Refuses to Appropriate Funds for the Risk Corridors Program.**

49.      Beginning with the change in control of the U.S. House of Representatives in

2011, Congress has repeatedly sought to frustrate the aims of the risk corridors program.  In December 2014, Congress passed the 2015 Spending Law, which prohibited the use of Medicare and certain other trust funds for fiscal year 2015 for risk corridors payments.  The two funds specifically mentioned in the 2015 Spending Law as sources from which risk corridors payments may not be drawn are designated throughout Division G of the 2015 Spending Law to fund other programs and initiatives under HHS.  But the 2015 Spending Law did not eliminate the use of all funds in the CMS Program Management account, such as fees received by HHS for the federally facilitated exchanges.  It also did not apply to years other than the fiscal year ending September 30, 2015.  Most notably, Congress *did not amend Section 1342 to require budget neutrality or to alter the underlying risk corridors obligations of the Government.*

50.     The 2015 Spending Law was enacted on December 16, 2014, nearly a year after Plaintiff began offering insurance on the newly-reformed and Affordable Care Act-compliant North Dakota, South Dakota, and Iowa exchanges and approximately 18 months after it had submitted rates for regulatory approval.  Faced with this new development, Plaintiff continued to abide by its obligations to the Government and its insured, but received little immediate guidance as to what would happen with the risk corridors payments.

51.     In December 2015, Congress passed the 2016 Spending Law, which continued the limits on the availability of funding for the risk corridors program.  As in the 2015 Spending Law, the 2016 Spending Law prohibited CMS from using trust funds and other accounts for the fiscal year ending September 30, 2016 to fund risk corridors payments.  But, like the 2015 Spending Law, *it did not amend Section 1342 to require budget neutrality or alter the underlying risk corridors obligations of the Government*.

52.     On September 9, 2016, CMS issued a memorandum reiterating the agency's

understanding that the Government owed "full" payment to insurers.[1]  That memorandum was followed by testimony of CMS Acting Administrator Andrew Slavitt before the House Energy and Commerce Committee on September 14, 2016.  Among other things, Mr. Slavitt stated without equivocation in response to a question posed by Representative Morgan Griffith that, notwithstanding the lack of an appropriation to fund the payments due insurers under Section 1342, it was "an obligation of the federal government" to remit full payment to insurers.[2]

53.    CMS's concession drew an immediate response from the House majority. In a letter of September 20, 2016 to HHS Secretary Sylvia Burwell, the leadership of the House Energy and Commerce Committee took issue with the positions expressed by CMS and Acting Administrator Slavitt, and demanded production by CMS of certain information and documents, including, among other things, the basis for CMS's viewpoint that the Government is obligated "to make insurers whole," the names of agency officials involved in discussions with Department of Justice about "risk corridors" litigation (such as the case at bar), and CMS's position on the use of the Judgment Fund to settle the Government's Section 1342 obligations.[3]

54.    The letter to Secretary Burwell was followed by letters sent by the same House Committee on or around October 4, 2016 to the chief executives of each of the QHP issuers that had, as of that date, filed complaints against the Government in the Court of Federal Claims

---

[1] CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF.

[2] *See* Press Release, The Energy and Commerce Committee, Obamacare Insurance Bailout Scheme (Sept. 20, 2016), *available at* https://energycommerce.house.gov/news-center/press-releases/ec-leaders-press-administration-lawsuit-scheme-circumvent-congress-and.

[3] House of Representatives & Committee on Energy and Commerce, Letter to the Honorable Sylvia Burwell (Sept. 20, 2016), *available at* https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/letters/20160920HHS.pdf.

seeking recovery of the risk corridors payments owed to them.

**E.      Plaintiff Has Suffered Substantial Harm as a Result of the Government's Refusal to Pay Amounts Owed.**

55.      Sanford Health Plan is a nonprofit insurer that invests millions of dollars in community endeavors designed to establish adequate health standards.  Sanford Health Plan further promotes expansive benefits coverage and superb quality in its healthcare model and has provided coverage to traditionally underserved populations, particularly rural communities.

56.      An issuer of QHPs is required by federal regulations to set its ACA-related health insurance rates well before the year they become effective.  This creates a challenge for QHP issuers like Sanford Health Plan, which seek to insure individuals who were previously uninsured and whose use of medical services once covered is difficult to predict.

57.      Section 1342 of the ACA requires the Government to reimburse Sanford Health Plan for higher than expected allowable costs incurred as a result of its participation in the marketplaces pursuant to the statutory formula, just as Section 1342 requires Sanford Health Plan or any other QHP issuer to pay CMS for lower-than-expected allowable costs.

58.      The risk corridors program is one of the principal marketplace premium stabilization programs created by the ACA.  It is designed to *limit* the effects of adverse selection and to *mitigate* the uncertainty inherent in building rates for new, unquantified health insurance risks in the context of a reformed regulatory framework.  While it might be an aspiration *of HHS*, for convenience as the program administrator, that the risk corridors program operate in a budget neutral manner that allows it to simply redistribute the premium revenues paid back into the program (from plans with lower-than-expected allowable costs) to those plans with higher-than-expected allowable costs, the risk corridors program was specifically crafted *by Congress* to avoid that linkage.  Under Section 1342, payments out are not contingent on payments in.

59.     On November 19, 2015, CMS released a document titled "Risk Corridors Payment and Charge Amounts for Benefit Year 2014," setting forth the amount of money CMS concedes that it owes to insurers (and is owed by insurers) for benefit year 2014 as a result of the risk corridors program.  The calculations are separated into individual market and small group market.  For benefit year 2014, Sanford Health Plan was *owed* $2,970,388.46 under the risk corridors program as a result of higher-than-expected allowable costs in the individual market.

60.     Similarly, CMS determined that Sanford Health Plan was *owed* $695,307.20 under the risk corridors program as a result of higher-than-expected allowable costs in the small group market.

61.     On or about December 21, 2015, CMS made an initial payment of $457,186.10 to Sanford Health Plan for the amount CMS concedes that it owes to Sanford Health Plan for benefit year 2014, which amounts to approximately 12.47 percent of the total owed.  Since its initial payment, CMS made additional payments amounting to $98,127.50.  In total, Sanford Health Plan has received $555,313.60—or approximately 15.1 percent—of the amount CMS concedes that it owes to Sanford Health Plan for benefit year 2014.

62.     On September 9, 2016, HHS published guidance on Risk Corridors Payments for 2015, stating that all benefit year 2015 collections would be used to pay outstanding liabilities for the 2014 benefit year.  That is, there would be no payments made for the 2015 benefit year.

63.     On November 18, 2016, CMS released a document titled "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year," setting forth the amount of money CMS concedes that it owes to insurers (and is owed by insurers) for benefit year 2015 as a result of the risk corridors program.  The calculations are separated into individual market and small group market.  For benefit year 2015, Sanford Health Plan was *owed* $4,959,637.75 under the

risk corridors program as a result of higher-than-expected allowable costs in the individual

market.  To date, CMS has paid no portion of the full amount CMS concedes that it owes to

Sanford Health Plan for benefit year 2015.

64.     Similarly, CMS determined that Sanford Health Plan was *owed* $909,904.23

under the risk corridors program as a result of higher-than-expected allowable costs in the small

group market.  To date, CMS has paid no portion of the full amount CMS concedes that it owes

to Sanford Health Plan for benefit year 2015.

**F.      The Government Owes Plaintiff 2014 Risk Corridors Payments.**

65.     On September 23, 2013, Plaintiff and CMS fully executed QHP Issuer

Agreements for Plaintiff's participation as a QHP issuer in the North Dakota, South Dakota, and

Iowa marketplaces.

66.     Consistent with CMS regulations, its agreements with CMS, and its policy,

Plaintiff began selling QHPs to consumers in North Dakota, South Dakota, and Iowa in or

around September 2013, with coverage effective January 1, 2014.

67.     Pursuant to its obligations under the ACA and 45 C.F.R. § 153.500 *et seq.*,

Plaintiff complied with its statutory requirements throughout the year and submitted all required

data for the risk corridors calculations by the statutory deadline of July 31, 2015.  *See* 45 C.F.R.

§ 153.530(d).

68.     On October 1, 2015, HHS announced that funds paid by QHP issuers into the risk

corridors program (payments in) would only be sufficient to cover 12.6 percent of risk corridors

payment requests (payments out).  Based on the Government's own official calculation, QHP

issuers generated $362 million in risk corridors gains for the Government, but QHP issuers

suffered $2.87 billion in compensable risk corridors losses.  The 12.6 percent that HHS

anticipated could initially be paid reflected a prorated redistribution of the $362 million received

from the few insurers that were required to pay the Government for the 2014 program year.

69.      As a result, although CMS conceded that Sanford Health Plan is entitled to $3,665,695.66 from the risk corridors program for the 2014 program year, the agency has only paid $555,313.60 of this amount (including its initial payment and its subsequent payments).

70.      With respect to its partial payments for benefit year 2014, HHS stated that it was "recording those amounts that remain[ed] unpaid following [its] 12.6 percent payment this winter as a fiscal year 2015 obligation of the United States Government for which full payment is required."  CMS, "Risk Corridors Payments for the 2014 Benefit Year" (Nov. 19, 2015).

71.      HHS's unilateral decision to pay only a small fraction of the amounts that it owes contradicts the express language of Section 1342, which states that if a plan's allowable costs "for any ***plan year***" exceeds the target amount, the Secretary "***shall pay to the plan***" the amounts set forth in the ACA.  The implementing regulations at 45 C.F.R § 153.510 expressly reiterate when a QHP's allowable costs "for any ***benefit year***" exceeded the target amount, "***HHS will pay the QHP issuer***" the amounts set forth in the ACA.

72.      HHS has provided no coherent explanation for its decision to short-pay health plans.  HHS stated that "[t]he risk corridors payments for program year 2014 [would] be paid in late 2015.  The remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections."  HHS concluded that in the event of a shortfall for the 2016 program year, HHS "***will explore other sources of funding for risk corridors payments, subject to the availability of appropriations***.  This includes working with Congress on the necessary funding for outstanding risk corridors payments."  HHS has, therefore, refused to pay an "obligation of the United States Government for which full payment is required," and seeks to leave its payment of this debt completely open-ended.

73.     The Government, by refusing to meet its payment obligations under the risk corridors program in violation of Section 1342, abrogates its responsibility with respect to one of the key features of the ACA, *i.e.*, providing market-stabilization in the new exchanges.

74.      The Government's refusal to pay money due under the risk corridors program gives rise to significant financial difficulties.  Sanford Health Plan has established itself as a community leader in healthcare.  Sanford Health Plan's and its corporate affiliates' community programs and outreach have changed the lives of millions of Americans.  Withholding risk corridors payments defeats the very purpose of the risk corridors program:  mitigation of the risk that QHP issuers like Sanford Health Plan are now assuming by providing adequate and affordable health coverage to all Americans, as desired by the ACA.   Withholding the payments violates both the letter and the spirit of the law.

**G.**      **The Government Owes Plaintiff 2015 Risk Corridors Payments.**

75.     On October 29, 2014, Plaintiff and CMS fully executed QHP Issuer Agreements for Plaintiff's participation as a QHP issuer in the North Dakota, South Dakota, and Iowa marketplaces.

76.     Consistent with CMS regulations, its agreements with CMS, and its policy, Plaintiff began selling QHPs to consumers in North Dakota, South Dakota, and Iowa on or about November 15, 2014, with coverage effective January 1, 2015.

77.     As it did in relation to its 2014 risk corridors payments, Plaintiff complied with its statutory requirements and submitted to HHS all data required by the ACA demonstrating that Sanford Health Plan experienced higher-than-expected allowable costs under the risk corridors program for benefit year 2015, entitling Sanford Health Plan to payment by HHS in the amount of $5,869,541.98.

78.     Yet again, however, HHS has stated that it will not make full payment as required

by the ACA for benefit year 2015.  Similar to the 2015 Spending Law, the 2016 Spending Law

prevents CMS and HHS from making risk corridors payments from certain funding sources.  As

a result, HHS has indicated that it will continue to treat the risk corridors program as "budget

neutral" (although there is no basis in the ACA for doing so), and will use any funds received

from QHP issuers for the 2015 risk corridors results to first pay down the $2.5 billion shortfall

from 2014.

79.     Despite the clear statutory mandate and its own multiple admissions of its

obligations to the contrary, HHS has stated that it will not make *any* payments to QHP issuers

this year.

*       *       *       *       *

80.     Regardless of HHS's statements that it will manage the risk corridors program in

a "budget-neutral" manner, and regardless of the acts of subsequent Congresses to limit the

availability of certain funds to make payments owed to QHP issuers under the risk corridors

program, the fact remains that the obligations of the Government under the ACA risk corridors

program *have never been amended.*  Section 1342 mandates payment to QHP issuers under

certain conditions *without regard to budget neutrality*, and for the very purpose of stabilizing the

market by mitigating annual losses of participating plans, a fact especially crucial for new

entrants who relied on the promise of Congress that cost overruns would be partially mitigated

through reimbursement.  Notwithstanding subsequent agency pronouncements, *made only after*

*QHP issuers such as Sanford Health Plan entered the market*, CMS's implementing regulation

(Section 153.510) reflected the mandatory nature of the payments without regard to budget

neutrality.

81.     Plaintiff relied upon the risk corridors program when it entered and participated in

the ACA exchanges, and when it designed and priced its 2014 and 2015 plans.  At the end of

benefit year 2014, Plaintiff was *owed* money based on its participation in both the individual and

small group market.  HHS paid only a small fraction of the total that was due.  The remainder in

the amount of $3,110,382.06 is owed and presently due.  By the same token, the $5,869,541.98

losses sustained in the risk corridors program for benefit year 2015 are owed and presently due to

Plaintiff under the express terms of Section 1342 of the ACA.  By this lawsuit, Plaintiff seeks the

immediate payment in full of risk corridors receivables for the 2014 and 2015 benefit years, so

that it can continue to offer affordable health insurance as contemplated by the ACA.

## CLAIM FOR RELIEF

## COUNT 1

### (Violation of Statutory and Regulatory Mandate to Make Payments)

82.     Plaintiff re-alleges and incorporates the above Paragraphs 1-81 as if fully set forth

herein.

83.     As part of its obligations under Section 1342 of the ACA and its obligations under

45 C.F.R. § 153.510(b), the Government is required to pay any QHP issuer certain amounts

exceeding the target costs they incurred in 2014 and 2015.

84.     Plaintiff is a QHP issuer under the ACA and, based on its adherence to the ACA

and its submission of allowable costs and target costs to CMS, satisfies the requirements for

payment from the United States under Section 1342 of the ACA and 45 C.F.R. § 153.510(b).

85.     The Government has failed, without justification, to perform as it is obligated

under Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and has affirmatively stated that it

will not do so.

86.     The Government's failure to provide timely payments to Plaintiff is a violation of

Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and Plaintiff and has been harmed by these failures.

## COUNT II

### (Breach of Implied-In-Fact Contract to Make Payments)

87.     Plaintiff re-alleges and incorporates by reference the above Paragraphs 1-86 as if fully set forth herein.

88.     Plaintiff entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely risk corridors payments to Plaintiff in exchange for Plaintiff's agreement to become a QHP issuer and participate in the North Dakota, South Dakota, and Iowa exchanges.

89.     Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. § 153.510), and HHS's and CMS's repeated admissions regarding their obligation to make risk corridor payments were made or ratified by representatives of the Government, including, but not limited to, Kevin Counihan, Director of Consumer Information and Insurance Oversight ("CCIIO") and CEO of the Health Insurance Marketplaces; Andrew Slavitt, Administrator of CMS; or other CMS officials, all of whom who had actual authority to bind the Government. Section 1342, CMS's implementing regulations, and the repeated admissions by agency officials with authority to bind the Government constitute a clear and unambiguous offer by the Government to make full and timely risk corridor payments to health insurers, including Plaintiff, that agreed to participate as QHP issuers in the ACA Marketplaces and were approved as certified QHP issuers by the Government at the Government's discretion.  This offer evidences a clear intent by the Government to contract with Plaintiff.

90.     Plaintiff accepted the Government's offer by agreeing to become a QHP issuer,

accepting the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the ACA, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq.*, and proceeding to provide health insurance on the North Dakota, South Dakota, and Iowa marketplaces. Plaintiff satisfied and complied with its obligations and conditions which existed under the implied-in-fact contract.

91.     The Government's agreement to make full and timely risk corridor payments was a significant factor material to Plaintiff's decision to participate in the marketplaces for these states.

92.     The parties' mutual intent to contract is further confirmed by the parties' conduct, performance and statements following Plaintiff's acceptance of the Government's offer, including the execution by the parties of QHP Issuer Agreements each year, and the Government's repeated assurances that full and timely risk corridor payments would be made and would not be subject to budget limitations. *See, e.g.*, 78 Fed. Reg. 15,409, 15,473 (Mar. 11, 2013).

93.     The implied-in-fact contract was also supported by mutual consideration:  The risk corridors program's protection from uncertain risks and new market instability was a real benefit that significantly influenced Plaintiff's decision to agree to become a QHP issuer and participate in the North Dakota, South Dakota, and Iowa marketplaces.  Plaintiff, in turn, provided a real benefit to the Government by agreeing to become a QHP issuer, complying with the obligations and conditions of the QHP Issuer Agreements, and participating in these marketplaces, as adequate insurer participation was crucial to the Government achieving the overarching goal of the ACA exchange programs—to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases

in premiums due to health insurer uncertainty.

94.     The Government induced Plaintiff to participate in the North Dakota, South

Dakota, and Iowa marketplaces for benefit year 2014 by including the risk corridors program in

Section 1342 of the ACA and its implementing regulations, by which the Government committed

to help protect health insurers financially against risk selection and market uncertainty.

95.     The Government repeatedly acknowledged its commitments to share risk with

QHP issuers and its obligations to make full and timely risk corridors payments to qualifying

QHP issuers through its conduct and statements to the public and to Plaintiff and other similarly

situated QHP issuers, made or ratified by representatives of the Government who had express or

implied actual authority to bind the Government.  *See, e.g.*, Patient Protection and Affordable

Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg.

17,220, 17,238 (Mar. 23, 2012).

96.     The Government also induced Plaintiff to commit to the North Dakota, South

Dakota, and Iowa marketplaces for benefit year 2015 during and after HHS and CMS's

announcement in 2014 of their intention to implement the risk corridors program in a budget

neutral manner, by repeatedly giving assurances to QHP issuers, including Plaintiff, that risk

corridors collections will be sufficient to cover all of the Government's risk corridors payments,

and that QHP issuers will receive full payments regardless of the collection amount.  *See, e.g.*,

CMS, "Risk Corridors and Budget Neutrality" (Apr. 11, 2014) ("We anticipate that risk corridors

collections *will be sufficient* to pay for all risk corridors payments.") (emphasis added);

Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 20,260

(May 27, 2015) ("*In the unlikely event of a shortfall* for the 2015 program year, HHS

recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.

In that event, ***HHS will use other sources of funding for the risk corridors payments***, subject to the availability of appropriations.") (emphases added).

97.     HHS and CMS acknowledged and published the full risk corridors payment amount of $3,665,695.66 that the Government concedes it owes Plaintiff for benefit year 2014. *See* CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015).

98.     HHS and CMS also acknowledged and published the full risk corridors payment amount of $5,869,541.98 that the Government concedes it owes Plaintiff for benefit year 2015. *See* CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016).

99.     Congress's failure to appropriate sufficient funds for risk corridor payments due, without modifying or repealing Section 1342 of the ACA, did not annul the Government's contractual obligation to make full and timely risk corridor payments to Plaintiff.  The Government is obligated to make full payment to Plaintiff, using the Judgment Fund.  Plaintiff is entitled to full payment from the Judgment Fund of the $3,110,382.06 in 2014 risk corridors payments and $5,869,541.98 in 2015 risk corridors payments.

100.     The Government's failure to make full and timely risk corridor payments to Plaintiff is a material breach of the implied-in-fact contract, and Plaintiff has been damaged by this failure.  Plaintiff therefore brings a claim for damages of $8,979,924.04 against the Government founded upon the Government's violation of an implied-in-fact contract.

## **PRAYER FOR RELIEF**

Plaintiff requests the following relief:

A.      That the Court award Plaintiff monetary relief in the amounts to which Plaintiff is

entitled under Section 1342 of the Affordable Care Act and 45 C.F.R. § 153.510(b):

$3,110,382.06 (for benefit year 2014) and $5,869,541.98 (for benefit year 2015).

B.      That the Court award pre-judgment and post-judgment interest at the maximum

rate permitted under the law;

C.      That the Court award such court costs, litigation expenses, and attorneys' fees as

are available under applicable law; and

D.      That the Court award such other and further relief as the Court deems proper and

just.

Dated: March 15, 2017                    Respectfully submitted,

                                         */s/ Stephen McBrady*
                                         Stephen McBrady, Esq.
                                         CROWELL & MORING LLP
                                         1001 Pennsylvania Avenue, NW
                                         Washington, DC 20004
                                         Tel: (202) 624-2500
                                         Fax: (202) 628-5116
                                         SMcBrady@crowell.com

                                         *Counsel for Sanford Health Plan*

OF COUNSEL:
Daniel Wolff, Esq.
Xavier Baker, Esq.
Sharmistha Das, Esq.
Chris Pinto, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 15, 2017, a copy of the forgoing complaint was filed

electronically using the Court's Electronic Case Filing (ECF) system.  I understand that notice of

this filing will be served on Defendant's Counsel via the Court's ECF system.

*<u>/s/ Stephen McBrady</u>*
Stephen McBrady, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116
SMcBrady@crowell.com
